***********
The undersigned reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction of the parties and the subject matter hereto, and all parties have been correctly designated and there is no question as to misjoinder on nonjoinder of the parties.
2. The alleged date of injury that gives rise to this claim is on or about April 21, 2000.
3. At the time of alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
4. At the time of the alleged injury, and employment relationship existed between plaintiff and defendant-employer, and defendant-employer was insured for Workers' Compensation coverage by American Interstate Insurance Company.
5. At the time of the injury, the plaintiff's average weekly wage was $254.43 which produces a compensation rate of $169.62.
6. Plaintiff's last day of work for defendant-employer was March 13, 2001, when he was taken out of work for medical reasons. Plaintiff was subsequently laid off by defendant-employer on March 14, 2001. Plaintiff initially missed work for medical reasons from April 22, 2000 until June 18, 2000, and from September 13, 2000 until September 21, 2000.
7. Plaintiff has been paid the following compensation:
 a. April 12, 2000 through June 16, 2000 at $160.00 per week.
 b. June 17, 2000 through June 18, 2000 at $ 173.34 per week.
 c. September 13, 2000 through September 14, 2000 at $173.34 per week.
 d. September 15, 2000 through September 21, 2000 at $213.34 per week.
 e. March 13, 2001 through the deputy commissioner hearing (and beyond) at $173.34 per week.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records and reports consisting of 123 pages.
2. Packet of Industrial Commission forms from the case.
3. Letter from Mr. Ekster to Jared Biro dated September 13, 2000.
4. Packet of discovery responses from defendants.
5. Physical therapy order and prescription from Wilmington Orthopedic Group.
6. Medical records submitted after the hearing on October 14, 2002.
7. Vocational reports submitted after the hearing on October 17 and November 8, 2002.
The pre-trial agreement submitted by the parties at the hearing is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. On the date of Deputy Commissioner hearing, plaintiff was twenty-four years old. He was originally from El Salvador and had a fifth grade education, which may have been a more comprehensive level of education than the equivalent grade in the United States. In addition, he had taken classes in English at his local community college. However, Spanish was his primary language and his English was limited. Plaintiff was in this country as an illegal alien at the time. Consequently, he could not obtain a driver's license and had to rely on his father for transportation.
2. In April 2000, plaintiff was employed by defendant-employer as a laborer. The company produced wood flooring and plaintiff's job involved running old lumber under a metal detector, removing any nails or hardware found, stacking lumber, occasionally loading lumber into the kiln, and packing the finished product for shipment. The employees of the company apparently went to old buildings in order to remove suitable lumber, as well. On April 21, 2000 plaintiff sustained a compensable injury by accident when he fell from the ceiling as he was removing timber. He landed on his back and also hit the back of his head.
3. The medical records for plaintiff's initial treatment were not placed into evidence. As of May 1, 2000, Dr. Candela, an orthopedic surgeon, was his treating physician. Dr. Candela reviewed his x-rays and concluded that he had sustained fractures at the twelfth thoracic and first lumbar vertebrae. Since he was complaining of some pain in his cervical spine as well, the doctor ordered a cervical MRI, which proved to be normal. Consequently, Dr. Candela continued to treat him conservatively. In June, plaintiff underwent an MRI of his head due to complaints of dizziness and headaches, but the test revealed no evidence of cerebral injury. However, it did show mastoiditis in his right ear. Dr. Candela therefore referred plaintiff to Dr. Kenyon, an otolaryngologist.
4. Dr. Kenyon examined plaintiff on June 27, 2000 and found that his eardrum had been ruptured and the ear was infected. It was the doctor's opinion that the eardrum perforation was due to the blow plaintiff sustained to his head when he fell. Dr. Kenyon treated the infection until it resolved and then performed surgery on September 5, 2000 to place an overlay graph onto the eardrum. The surgery was successful and on October 4, 2000 it appeared that the graph had completely taken. However, it took some time before the graphed eardrum vibrated properly, so plaintiff continued to experience some decreased hearing for a while.
5. One of the common complications from such an injury to the eardrum and the resulting surgery was a cholesteatoma, an accumulation of dead skin developing within the ear. By March 2001 plaintiff had developed cholesteatomas in his outer and middle ear, so Dr. Kenyon performed a surgical procedure to remove them. Plaintiff developed another cholesteatoma by the following August and underwent another operation on September 6, 2001 to remove it. Although Dr. Kenyon thought that the problem might recur and expected to perform further surgery in March 2002, the CT scan performed at that time was clean. Consequently, Dr. Kenyon did not perform additional surgery and expected that plaintiff would not require further surgery in the future.
6. With respect to plaintiff's back injury, Dr. Candela released him to return to work at light duty in June 2000 and regular duty in July 2000. As of July 14, 2000, it appeared from the x-rays that the vertebral fractures had completely healed so there was no further treatment the doctor could offer. He rated plaintiff with a fifteen percent permanent partial disability to the back and released him from care. Plaintiff still experienced some back pain at that time and wanted a second opinion. Consequently, on October 5, 2000, plaintiff was seen by Dr. Rice, another orthopedic surgeon. Dr. Rice reviewed his x-rays and determined that there had only been one compression fracture that was at the end-plate of L1. Current x-rays showed good healing with very minimal compression, so Dr. Rice indicated that plaintiff had reached maximum medical improvement and could engage in regular activities with respect to his back condition. Dr. Rice did not believe that plaintiff had sustained any permanent partial disability.
7. Plaintiff returned to work for defendant-employer on June 19 at light duty, where he just scanned wood for metal. He later gradually worked back into his regular job, which he performed satisfactorily without apparent difficulty. On September 13, 2000 he went back out of work for his ear surgery and he returned to work on September 22, 2000. When he had his second ear operation on March 13, 2001, he again went out of work and was to be out for no more than a week. Although Dr. Kenyon released him to return to work on March 19, 2001 without restrictions, his employer had laid him off, along with 11 other employees, while he was out with his surgery. There had been a significant decline in business, which precipitated the layoff of employees. Consequently, plaintiff, who was physically capable of performing his regular job duties, was unable to return to work in his former position. The only other time plaintiff was kept out of work due to disability from his injury was on September 6, 2001 when he had the last operative procedure to his ear. Dr. Kenyon advised the caseworker that there would only be one day, the day of surgery, where plaintiff would be unable to work due to that procedure.
8. Defendants admitted liability for benefits under the Workers' Compensation Act for plaintiff's April 21, 2000 injury by accident pursuant to a Form 60 and paid compensation to him for temporary total disability during the periods he was out of work up to the time of the March 2001 operation. Defendants continued to pay compensation to plaintiff after March 19, 2001 when Dr. Kenyon released him, although they soon filed a Form 24 request to stop payment on the basis that plaintiff was out of work due to the overall economic slow down and not due to any disability associated with his injury. Their request was denied by the Executive Secretary's office. Consequently, they began to provide vocational placement assistance. The vocational case managers' efforts were hampered by plaintiff's lack of a driver's license and his limited ability to speak English. Because plaintiff did not have proper documentation to be in the country, the former problem could not be addressed.
9. In January 2002, Carlos Encinas, a bilingual case manager, was assigned to work with plaintiff. Plaintiff received an offer of employment with Food Lion that month, but plaintiff rejected the offer because the position was for part-time work. Mr. Encinas coached plaintiff regarding his appearance, his presentation, and his English. Mr. Encinas determined that plaintiff, despite plaintiff's illegal status and his lack of transportation, would be able to find employment if he diligently sought work and was willing to work. To facilitate the search, Mr. Encinas sent plaintiff to the local community college for classes on learning English as a second language.
10. Plaintiff has been physically capable of performing his regular job with defendant-employer since late September 2000, except for two very short periods associated with the outpatient ear procedures by Dr. Kenyon in March and September 2001. Had it not been for the reduction in business associated with the company-wide layoffs due to the economic downturn, he would have returned to work for defendant employer after each of those procedures. The greater weight of the evidence establishes that the plaintiff's inability to earn wages since March 2001 was due to the layoff and plaintiff's lack of interest in returning to work, and not due to any disability associated with plaintiff's injury. In addition, despite plaintiff's lack of enthusiasm for obtaining another job, plaintiff could have been earning wages in at least one part-time job that was specifically offered to him by a local grocery store. The evidence establishes that work was available which was suitable for plaintiff, including positions as a bus boy, a kitchen helper, an office cleaner, and as a stocker at other grocery stores. Moreover, the evidence establishes that plaintiff appeared to be trying to sabotage efforts to find alternative employment. Finally, plaintiff had no driver's license due to his illegal status. This created an additional barrier to plaintiff's finding and attending work.
11. Plaintiff reached maximum medical improvement with respect to all of his work-related injuries by no later than March 2002. He was physically capable of earning his former average weekly wage of $254.43 at that time. However, he had been laid off from his job due to reasons unrelated to his injury. As a result of his injury on April 21, 2000, he sustained a ten-percent permanent partial disability to his back. He also was expected to sustain some disability of less than ten percent to his right ear. However, Dr. Kenyon never specifically provided that rating.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff is not currently disabled as a result of his compensable injuries. Plaintiff was performing his normal duties prior to his outpatient ear surgery and he was released to return to work without restrictions after the ear surgery. Plaintiff could have returned to work for defendant-employer but for company-wide layoffs associated with the economic downturn. Plaintiff was physically capable of returning to work at his regular job after September 2000. G.S. §§ 97-29, -30; Hilliardv. Apex Cabinet Company, 305 N.C. 593 (1982); Russell v. Lowe's ProductsDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993); Demery v.Converse, Inc., 138 N.C. App. 243 (2000). Under the Russell test, plaintiff may establish disability in one of four ways:
 the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment;
 the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment;
 the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or
 the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
See Russell v. Lowe's Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). Significant to this case is the requirement that the disability must result from a compensable injury. See Lanning v.Fieldcrest Cannon, 352 N.C. 98, 530 S.E.2d 54 (2000). Because plaintiff would have returned to work at his regular job without restrictions after his ear operations but for a layoff, which was due to economic conditions unrelated to his injury, his loss of earnings was not due to any disability arising from the injury. G.S. § 97-2(9); Hilliard vs. ApexCabinet Company, 305 N.C. 593 (1982); See 4 Larson's Workers'Compensation Law § 84.03.
2. After plaintiff returned to work on September 22, 2000, he was entitled to compensation for temporary total disability from March 13, 2001 through March 19, 2001 and for September 6, 2001. Otherwise, he was not entitled to such compensation inasmuch as he was not disabled as a result of his injury. G.S. §§ 97-2(9); 97-29; Hilliard vs. ApexCabinet Company, 305 N.C. 593 (1982).
3. Defendants have overpaid compensation to plaintiff for temporary total disability and are entitled to a credit as against other compensation due. G.S. § 97-42.
4. Although plaintiff has sustained a ten percent permanent partial disability to his back and a permanent partial disability to his ear of something less than ten-percent and although he would ordinarily be entitled to compensation for such disability, defendants have overpaid compensation in an amount in excess of the compensation due for permanent partial disability. Consequently, no additional compensation is awarded. G.S. §§ 97-31(18) (23); 97-42.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, subject to Section97-25.1. G.S. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for further compensation is DENIED. Rather, defendants are entitled to a credit for the temporary total disability compensation overpaid.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, subject to Section 97-25.1.
 3. Each side shall pay its own costs. S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER